## Case No. 6,998.

### The IDAHO.

[11 Blatchf. 218.] 1

Circuit Court, E. D. New York. July 2, 1873. 2

DELIVERY OF GOODS—TITLE OF SHIPPER—DENIAL OF BY CARRIER—CONFUSION OF GOODS.

1. M. shipped, at New York, on a steamship, for Liverpool. 200 bales of cotton, and received from the vessel a bill of lading therefor, which he endorsed to the libellant, who had purchased the cotton. At Liverpool, the vessel delivered 165 bales of the cotton to the agent of P., who claimed to own the cotton. As to 140 bales, it was shown that P. was the real owner of them. As to the remaining 25 bales, it was shown that the libellant, who originally owned such 25 bales, had intermixed and confused them with the 140 bales, in an effort to obliterate the original marks on the 140 bales, so as to prevent their identification by other persons claiming them, and it did not appear that the 140 bales could have been identified, at Liverpool, so as to be separated out of the 165 bales, and the bales were of different grades or qualities, and different values: Held, that the delivery of the 165 bales to the agent of P., at Liverpool, was proper, and that the libellant could not recover the value of any of them from the vessel.

2. The rule that the carrier cannot dispute the title of the shipper of goods. is subject to two conceded exceptions—1st, where the true owner has compelled a delivery to himself by judicial proceedings; 2d, where the shipper has obtained possession of the goods by fraud or

---

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

2 [Affirming Case No. 6,997. Decree of circuit court affirmed in 93 U. S. 575.]

felony, and they have been delivered by the carrier to the true owner. Moreover, the carrier may defend himself by proof of actual delivery of the goods to the true owner, although without judicial compulsion. The true rule is, that the carrier cannot dispute the shipper's title, while retaining the possession of the goods; but he may, if he have actually delivered them to the true owner.

[See note at end of case.]

3. The master of a vessel signed a bill of lading for 140 bales of cotton, as shipped on board. The bill was endorsed to P., and he advanced money on the faith of it. No such cotton was on board of, or had been delivered to, the vessel, when the bill was signed. Seven days afterwards, the 140 bales were delivered on the wharf at which the vessel was lying, in the usual place of deposit for cargo to be taken on board, and were received by the mate of the vessel, on its behalf, and receipted for in the name of the vessel, by her proper officers, but were not put on board. Afterwards, and on the same day, the cotton was removed by the shipper: Held, that the cotton was delivered to the vessel, and that P. became its owner, as against all persons whose rights did not accrue prior to the delivery of the cotton to the vessel.

4. The rule stated, in respect to a confusion of goods.

[See note at end of case.]

[Appeal from the district court of the United States for the Eastern district of New York.]

In admiralty.

James Emott, for libellants.
William G. Choate, for claimant.

HUNT, Circuit Justice. This is a libel for the non-delivery of 165 bales of cotton. The district court dismissed the libel [Case No. 6,997], and the libellants appealed to this court. On the 4th of May, 1869, Thomas W. Man shipped, at New York, on the steamship Idaho, for Liverpool, 200 bales of cotton. Man received a bill of lading, and endorsed it to James Finlay & Co., Liverpool, at the request of the libellants, to whom he had previously sold the cotton. On arrival at Liverpool, 165 bales of the cotton were delivered to Baring, Brothers & Co., and 35 to the libellants, their demand for the residue being refused. The delivery to Baring, Brothers & Co. was upon the order of William J. Porter & Co., who claimed to own the cotton. The delivery of the cotton to the agents of Porter & Co. is justified on the grounds: 1. That Porter & Co. were the owners of the cotton; 2. That the cotton was taken from the vessel by the sheriff of New York, upon a replevin proceeding against the vessel, instituted by the direction of Porter & Co. If the first proposition is a sound one, and the facts fall within the principle, it will not be necessary to discuss the second one.

It is laid down in the books, that a carrier cannot set up, against the shipper, a naked jus tertii, or adverse title of a hostile claimant. Story, Bailm. §§ 266, 582; Ang. Carr. § 335. It is conceded, however, that, where the true owner has compelled a delivery to himself by legal proceedings, such delivery

is a defence to the claim of the shipper. So, it is conceded, that, where the shipper has obtained the goods by fraud or felony, the carrier may deliver them to the true owner. I am of the opinion, that this rule is subject to another qualification, to wit, that the carrier still holds the goods in his possession. A carrier receiving goods from A., for carriage, cannot, when called upon for the goods, which are still in his possession, defend himself by saying that B. is the true owner of the goods. But, if he have actually delivered the goods to B., and B. is the true owner of them, then, I conceive, he may so answer. Among others, two reasons may be given for this rule. The delivery to the carrier, and his undertaking to transport and deliver, are based upon the assumption and representation, by the shipper, that he is the owner of the goods, or, at least, that he has such title that he has a right to deliver them to the carrier, and to receive them on arrival at their destination. Thus, it is conceded, that, if the shipper has stolen the goods, or obtained them by fraud, he cannot enforce against the carrier the contract to deliver, although the carrier still retains the goods in possession. This is upon the theory that he never had title to the property, and that the carrier's contract was based upon the contrary assumption, which failing, his obligation ceases, and that he holds the property for delivery to the owner. If there be no title in the shipper, and the goods are already delivered to the real owner, the reason of the rule is still stronger. The carrier cannot relieve himself upon a theoretical idea of non-ownership in the shipper, unless where the goods are obtained by fraud or felony. Public policy will not permit him to hold the goods for his own benefit, and deny the title of his shipper. If, however, he is content to assume the burden of proving another to be the true owner, and to show that he has made delivery to such owner, he should be discharged of his contract to deliver to the assumed owner. Bassett v. Spofford, 45 N. Y. 387; Bliven v. Hudson River R. Co., 36 N. Y. 403; Rogers v. Weir, 34 N. Y. 463; Sheridan v. New Quay Co., 4 C. B. (N. S.) 618; Finlay v. Liverpool & G. W. Steamship Co., 23 Law T. [N. S.] 251. Another reason for this rule is, that, in case of such delivery, no damage is sustained by the shipper. Not being the owner of the goods, he loses nothing to which he was entitled. The true owner, the party entitled to damage in case of a loss of the goods, has them. The position is the same as if the goods were delivered to the shipper, and at once recaptured from him by the true owner. The rule, that the carrier may deny the shipper's title, where he has delivered the goods to the true owner, is founded in justice, and does not seem to be liable to the same objections as where the goods are held by the carrier. It differs from the rule, that delivery under a judicial proceeding is a defence, only in the nature of the evidence that the goods were owned by, and have been delivered to, the true owner. The propositions are based upon the same principle. I think it is the true rule.

Whether Porter & Co. were the true owners of the cotton is a compound question of law and of fact. Porter & Co.'s title is based upon bills of lading dated April 1st, 1869, certifying to the shipment on board of the brig C. C. Colson, of 140 bales of cotton, with marks, and of certain weights, and signed by Julius Patt, as master thereof. Accompanying the bills of lading, and based upon them, were drafts to the amount of about $18,000, which were paid by Porter & Co., or credited to the account of the shippers. The title of the appellants was based upon an actual shipment on the Lodona, the forwarding of a bill of lading, and the delivery of the cotton in dispute. The facts in relation to the shipment to Porter & Co. are substantially as follows: When the bill of lading was signed by the master of the Colson, on the 1st of April, 1869, no such cotton as described in it was on board, or had been delivered to the vessel. The bill was executed by mistake or by fraud. It is said that the cotton was actually delivered on the 8th of the same month, and that the bill of lading became operative and effectual from the time of such delivery, no rights of other parties intervening before such delivery. Rowley v. Bigelow, 12 Pick. 314; Halliday v. Hamilton, 11 Wall. [78 U. S.] 565. This appears to be the law. Was there a delivery on the 8th of April, 1869? On the morning of that day, the 140 bales of cotton in question were drawn from the cotton press, and delivered to the Colson for shipment, in the manner testified to by F. M. Roby, the mate of the vessel. Another vessel laid next to the wharf. Close to her, and outside of her, laid the Colson. Mr. Roby says: "These bales were delivered at the wharf at which the Colson was then lying, upon which all cargoes intended for her were deposited. I received the cotton, as mate, on behalf of said brig, and it was not put on board. When received, the cotton was deposited on the wharf, within forty feet of the Colson. It remained there, in my custody, as mate, from some time in the morning of the 8th of April, 1869, when it was brought there, until the evening of that day, when it was carried away. * * * The tackling of the Colson did not reach to the place on the wharf where the cotton was deposited. * * * The wharf was the usual and only place to deposit freight, when delivered to the vessel to be taken on board. This cotton was deposited in the usual and customary place for cargo to be deposited for the Colson. * * * I gave receipts for 126 bales of cotton of the 140 bales, and Mr. Keenan, second mate, receipted for 14 of the bales." The receipts

mentioned were to the Shipping Press Co., from whence the cotton was sent to the Colson by the order of Forbes, the shipper, and were in the following form: "New Or-leans, April 8, 1869. Brig C. C. Colson. Received, in good order, from Saul, Boyd & Co., Shippers' Cotton Press, * * * bales cotton, marked * * *. F. M. Roby." The cotton was removed on the evening of the same day, by Forbes. I cannot doubt that this constituted a good delivery of the cot-ton to the vessel, and that, from the mo-ment of such delivery, the cotton was in the custody of the vessel, and was, in law, ship-ped on the vessel. It was a delivery to, and a receipt by, the vessel, for the purpose of shipment. It was the commencement of the liability of the carrier, which dates from the time the goods are received by him for the purpose of transportation. 1 Pars. Mar. Law, 132, note 1, where the cases are re-viewed. The bill of lading attached from the receipt of the goods, and it was the duty of the officers of the vessel to have retained them, to answer to the claim of the holder of it. Whoever then and afterwards held the bill of lading was the owner of the goods. Their subsequent removal, while it might induce the successful perpetration of a fraud, did not affect his title. Bailey v. Hudson River R. Co., 49 N. Y. 70.

The statute of Louisiana, which prohibits and makes criminal the delivery of a bill of lading, except upon a receipt of the goods, does not affect the case. The bill of lading, when delivered, was of no effect, and the statute cannot make it more than void. What is the effect of a subsequent delivery, is not within the scope of the statute. There is no reason to suppose that the statute was intended to prevent the remedying of a mis-take, or the reparation of a wrong, so far as it was in the power of the party to do it. The goods were shipped on the 8th of April, to Porter & Co., and, by such shipment, and the previous bill of lading, their title became perfect.

As the holders of this bill of lading, Porter & Co. were the true owners of this property. The carrier delivered it, in Liverpool, to their agents, and, according to the suggestions al-ready made, such delivery discharged him from liability to a shipper who was not such owner.

The details of this case are extended. Nu-merous questions of law as well as of fact were argued by the respective counsel. They do not affect the main propositions herein-before stated. If I am correct in these, the case, in its general principle, was well de-cided below. I have not discussed the ques-tion of identification, as I am satisfied that the cotton delivered to the Colson is the same that was shipped on the Idaho, and the sub-ject of the present suit. I have not dis-cussed many points which were elaborately argued on both sides, nor have I attempted an analysis of the cases upon disputed ques-tions. I have passed upon facts enough to justify a conclusion, and have referred to authorities so far as I conceive it to be nec-essary to sustain the positions taken.

In addition to the 140 bales of cotton, the agents of Porter & Co. received from the ves-sel 25 other bales, which were originally the property of the appellants. This has result-ed from an intermixture and confusion of the goods by the appellants, in their efforts to obliterate the original marks upon the 140 bales, so as to prevent their identification by other claimants. If not in bad faith, the con-duct of the appellants, in that respect, was unwise and unfortunate. It is possible, that, with great effort, the different parcels might have been separated, and the 140 bales iden-tified, at Liverpool. I cannot say that this could have been done at all, certainly not easily. The bales were of different grades or qualities, and of different values. The set-ting apart of 140 bales would not certainly give to the owner the value of the cotton to which he was entitled. The difficulty of de-termining which were his bales and which were not, seems almost insuperable.

The rule on this subject is thus laid down by Chancellor Kent: "With respect to a confusion of goods, where those of two per-sons are so intermixed that they can no long-er be distinguished, each of them has an equal interest in the subject, as tenants in common, if the intermixture was by consent. But, if wilfully made, without mutual con-sent, then the civil law gave the whole to him who made the intermixture, and com-pelled him to make satisfaction in damages to the other party for what he had lost. The common law gave the entire property, with-out any account, to him whose property was originally invaded, and its distinct character destroyed. If A. will wilfully intermix his hay or corn with that of B., or casts his gold into another's crucible, so that it becomes impossible to distinguish what belonged to A. from what belonged to B., the whole be-longs to B. But, this rule is carried no far-ther than necessity requires, and, if the goods can be easily distinguished and separated, as articles of furniture, then no change of property takes place. So, if the corn or flour mixed together were of equal value, then the injured party takes his given quantity, and not the whole. This is Lord Eldon's construction of the cases in the old law. But, if the articles were of different value or quality, and the original value not to be distinguished, the injured party takes the whole. It is for the party guilty of the fraud to distinguish his property satisfac-torily, or to lose it. No court of justice is bound to make the discrimination for him." 2 Kent, Comm. 364, 365; Lupton v. White, 15 Ves. 432, 440; Chedworth v. Edwards, 8 Ves. 46. I have had much doubt upon this branch of the case, but I am not able to say that the decree is erroneous.

The transactions in the courts of New Or-

leans cannot affect the question in litigation, which is simply as to the ownership of the 165 bales of cotton, when delivered in Liverpool to the agents of Porter & Co. If they were then properly delivered to them, the decree is right, and must be affirmed. The accounts of the parties, or any equitable claims arising from other transactions, must be disposed of in a suit to be brought for that purpose. The decree is affirmed, with costs.

[NOTE. The libellants then appealed to the supreme court, where the decree was affirmed in an opinion by Mr. Justice Strong, who said that actual delivery by the bailee on the demand of the true owner, who has the right to the immediate possession of the goods bailed, is a good defense to the claims of the bailor. This is not confined to the two exceptions mentioned by the circuit court. The owner of goods who willfully and wrongfully mixes them with those of another of a different value and quality, so as to render them undistinguishable, is not entitled to any part of the intermixture. 93 U. S. 575. See Case No. 6,996.]